IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 15, 2012

## STATE OF TENNESSEE v. AKEEM T. GOODMAN

**Appeal from the Criminal Court for Knox County**
**No. 93059   Bob R. McGee, Judge**

---

**No. E2011-02044-CCA-R3-CD - Filed December 20, 2012**

---

The Defendant, Akeem T. Goodman, was convicted by a Knox County Criminal Court jury of attempted first degree murder and especially aggravated robbery, Class A felonies. See T.C.A. §§ 39-13-202, -403 (2010). The trial court sentenced the Defendant to consecutive Range I terms of twenty-two years at 100% service as a violent offender for an effective forty-four-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred by ordering consecutive sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

J. Liddell Kirk (on appeal) and Mary Ward (at trial), Knoxville, Tennessee, for the appellant, Akeem T. Goodman.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the shooting and robbery of Nicholas Baker. At the trial, Xavier Waters testified that he and the victim were friends and that he knew the Defendant. He said that on April 9, 2009, around 5:00 p.m., he was in the parking area of Angela "Sissy" Price's apartment, that he saw the Defendant there, that he and the Defendant talked, and that the Defendant had a gun. The Defendant showed the gun to him and said it was a .40 caliber.

He said the Defendant's friend, NJ Davis, had a .38 caliber gun. He said Jack Bolden was there. He said he went home and did not see the victim, the Defendant, or Mr. Davis again that night.

On cross-examination, Mr. Waters testified that he and the victim were not related but had been good friends for a long time. He agreed that he told the police he saw Jack Bolden driving a 1987 or 1989 black or blue Chevrolet at 5:00 p.m. the day of the shooting. He noticed that the door handles were broken and that Mr. Bolden was the only person in the car. He said he met Mr. Bolden two years ago at school but denied "hanging out" with him. He denied knowing if the Chevrolet was involved in the shooting. He said he and the Defendant had argued in the "past years" but denied fighting the Defendant. He denied knowing Brandon Brooms. On redirect examination, Mr. Waters stated that Mr. Bolden had the Chevrolet "to rob somebody or something." He said the Defendant, Mr. Bolden, and Mr. Davis left the parking area together.

Angela Price testified that on April 9, 2009, she lived on East Fifth Avenue and knew the Defendant and the victim from "the neighborhood." She said that teenagers and young men "hung out" in the parking area of her apartment. She said that at night, the area was dark because there was no lighting. She said that she saw the Defendant in the parking area in the early afternoon and that he was alone. She said that around 3:30 p.m., the Defendant met a friend in the parking area and that the victim was also there. She said that there were about five or six young men there and that they shot dice. She said everyone left the parking area, including the victim. She said the victim returned around 9:00 p.m. to the parking area and called her around that time. She said she heard gunshots soon thereafter.

Ms. Price testified that when the victim called around 9:00 p.m., she was washing dishes and cleaning her apartment. She said that she heard a loud bang on her door after she finished talking to the victim, that she looked outside, that she saw the Defendant near the steps leading to her door, and that the Defendant put a gun in her face. She said she moved the gun from her face, returned to her apartment, and began cleaning. She said that because it was dark, she could only see the victim and the Defendant. She did not recall either of them talking. She said that about ten minutes later, she heard multiple gun shots, ran to the door, and heard the victim screaming. She said that she ran to the victim, who was bloody, and that nobody else was outside when she reached the victim. She called 9-1-1.

Ms. Price testified that the victim was wearing a white t-shirt and a pair of boxer shorts and that the victim screamed, "[T]hey took everything." She said that "they took his pants and his phone." She said the police took the victim's jacket and shoes. She recalled telling the 9-1-1 dispatcher that she thought the gun was a .22 caliber pistol but said she was guessing because she did not know much about guns. She said she did not know what type

of gun she saw. She said that while she and the victim waited for the paramedics, the victim faded "in and out." She said a neighbor came outside and waited with her and the victim until the ambulance arrived. She said her neighbor was there when she spoke to the 9-1-1 dispatcher.

On cross-examination, Ms. Price testified that she talked to Knoxville Police Investigator Ryan Flores the night of the shooting and that she told him she saw a .22 caliber silver pistol. She said she looked at the barrel but was unsure what type of gun it was. The 9-1-1 recording was played for the jury, which showed that Ms. Price told the dispatcher she saw the Defendant with a .22 caliber handgun. She identified the Defendant as the shooter, said the Defendant put a .22 caliber handgun in her face, and gave a description of the Defendant's clothing. She agreed that she told the dispatcher that she saw a .22 caliber handgun but said that she was panicked and terrified that the victim was going to die.

Ms. Price testified that the victim did not tell her why he returned to the parking area when he called around 9:00 p.m. She agreed the area where the shooting occurred was dark but said there was enough light to see the Defendant and the victim on the steps leading to her door. She said the victim was at the bottom of the steps and the Defendant was on the fourth step. She said that the kids in the neighborhood fired pellet guns frequently and that she thought the Defendant was "playing around" when she saw the gun.

Ms. Price testified that she had known the victim since 2007 and that she had known the Defendant about two or three months at the time of the shooting. She said someone dropped off the Defendant around 3:30 p.m. the day of the shooting. She said the person was short and wore a red cap and a jacket with "M&M" on it. She said that she had never seen the person before that day and that she learned later the person was Mr. Davis. She agreed she might not have seen a person standing on the side of her apartment building during the shooting.

Ms. Price testified that she did not know Mr. Bolden and that she did not know everyone who "hung out" in the parking area of her apartment building. She agreed it was possible Mr. Bolden could have been there at some point. She said she was told later that Mr. Bolden drove the black Chevrolet the day of the shooting. She said that after school on the day of the shooting, the victim, the Defendant, and four or five other young men were in the parking lot area and that they stayed for a few hours. She said that she did not notice any problems between the Defendant and the victim during that time but that the Defendant and Mr. Davis appeared mad and cursed as they left that evening.

On redirect examination, Ms. Price testified that she previously testified in juvenile court that she did not know Mr. Bolden personally and that she learned Mr. Bolden drove the black Chevrolet by talking to the police, attorneys, and people affiliated with juvenile court. She agreed she did not see Mr. Bolden outside her apartment at the time of the shooting. She said that she heard the second gunshots "very quickly" after the first gunshot.

The victim testified that he had known the Defendant for about two years. He said that on April 9, 2009, he arrived at the parking area at Ms. Price's apartment building around 11:00 a.m., that nobody else was there at the time, and that he called Mr. Waters to meet him there. He said the Defendant arrived around 2:00 or 3:00 p.m. with his cousin, Mr. Davis. He said that they shot dice for money in the parking lot and that he won money from Mr. Waters, Mr. Davis, and the Defendant. He said Mr. Bolden, the Defendant's cousin, arrived later that afternoon on foot. He said the Defendant, Mr. Davis, and Mr. Bolden left together. He said he and Mr. Waters stayed about ten minutes after they left. He said he left to go fishing.

The victim testified that he returned to Ms. Price's apartment to meet the Defendant. He said the Defendant called him and wanted to buy "some hydros." He agreed he was going to sell the pills to the Defendant. He said that when he arrived, the Defendant, Mr. Davis, and Mr. Bolden were already there. He said that they were standing near the steps, that he walked toward them, and that a "big black thing" was placed on the side of his face. He said that Ms. Price opened the door, that the Defendant stuck a gun in her face, and that the Defendant told her to close the door. He said that the Defendant told him to empty his pants pockets and that he told the Defendant to stop joking. He said the Defendant shot him in the leg and demanded his money again. He stated that he threw his money onto the ground and that the Defendant picked up his money and gave it to Mr. Bolden. He said Mr. Bolden began counting the money and asked if he was going to tell the police. He told Mr. Bolden, "No." Mr. Bolden said the victim had seen their faces and told the Defendant to "kill him." He said the Defendant began shooting while he was still on the ground. He said Mr. Davis did not say or do anything during the incident.

The victim testified that he first saw the Defendant's gun earlier that day when they shot dice and that the Defendant let him hold the gun. He said Devon, Ms. Price's neighbor, came outside to help until the paramedics arrived. He recalled getting into the ambulance and saying that the Defendant shot him. The victim was hospitalized for six months, underwent several surgeries, suffered a broken hip and tailbone, and had his left arm amputated. He said he was shot about sixteen times. He stated that because he was comatose for about four months, he underwent rehabilitation for three months to learn to walk again.

On cross-examination, the victim testified that he had not known Mr. Davis very long and that he did not recall seeing Mr. Davis wearing a jacket the day of the shooting. He agreed he and the Defendant were good friends before the shooting and shot dice frequently. He said that he shot dice for about thirty to forty-five minutes the day of the shooting. He said the Defendant had a black gun the day of the shooting. He recalled telling Ms. Price that "they [took] everything" and asking her to call 9-1-1. He denied talking to Devon while waiting for the paramedics. He said he told Ms. Price that the Defendant shot him.

The victim testified that he did not recall what the Defendant, Mr. Bolden, or Mr. Davis wore the night of the shooting. He said that when Ms. Price opened the door the first time, the Defendant was standing behind him on the steps and slightly to his left. He said that when Ms. Price opened the door, the Defendant pointed his gun at her, told her to close the door, and threatened to shoot her.

Knoxville Police Officer Beth Goodman testified that she responded to the crime scene, that she documented the evidence and took photographs, that she saw several shell casings near the steps, and that she saw a bullet fragment in the exterior wall of Ms. Price's apartment. She collected nine .40 caliber shell casings, a pair of shoes, a jacket, bullet fragments, a cigar tip, and a lighter. Photographs of the scene were received as exhibits. She was unable to determine the caliber of bullet from the fragment found inside the exterior wall. She said that the bullet casings were found close together and concluded that the casings were ejected from the same area. She said a bullet fragment was removed from the victim during surgery. On cross-examination, Officer Goodman stated that the light at the steps was off when she collected evidence. She agreed the police did not test the cigar tip found at the scene and said she did not return to the scene after she left around 11:00 the night of the shooting. She denied failing to find or to collect evidence. She denied performing tests on the recovered shell casings. The parties stipulated that Knoxville Police Officer Patricia Resig's firearm examination report showed that the .40 caliber Smith & Wesson Remington Peters cartridge cases found at the scene were fired from the same unknown gun.

Knoxville Police Sergeant Nevin Long testified that when he arrived at the scene, the paramedics were treating the victim and that he was not able to obtain a statement from him until May 23, 2009. He said that the victim was able to identify the shooter and that the victim's testimony was consistent with his statement on May 23. He said he interviewed Ms. Price, Mr. Bolden, and Mr. Brooms the night of the shooting. He said Mr. Davis refused to give a statement. He said that nothing in Mr. Bolden's statement led to criminal charges.

Sergeant Long testified that the physical evidence in the case showed the Defendant shot the victim. He said that the only evidence showing Mr. Bolden and Mr. Davis were involved in the shooting was the victim's testimony. He said the victim was not healthy enough to leave his home until the day before the trial. He said a .40 caliber semiautomatic handgun was used to shoot the victim. He said there were several makes and models of semiautomatic .22 caliber handguns on the market. He said that .40 caliber handguns varied in size and color and that a .40 caliber handgun might be silver and black, depending upon the make and model. He did not recover the handgun used to shoot the victim. He agreed the Defendant was not arrested until April 15, 2009.

Sergeant Long testified that a 9-1-1 call was received about an abandoned black Chevrolet car on Carson Road, that two officers responded and searched the car, and that the owner arrived to claim the car. He said that the police determined the car was not involved in the shooting and that the car was released to the owner. He did not recall Ms. Price telling him that she saw a car leaving the scene.

On cross-examination, Sergeant Long testified that Mr. Bolden and Mr. Brooms drove around in a black Chevrolet car with twenty-two inch wheels the day of the shooting. He said that when the police investigated the abandoned car, they found a jacket with "a cereal or a candy logo" and a pair of jeans. He agreed the car was released to Mr. Brooms's mother. He said he interviewed Mr. Brooms, who said he was with Mr. Bolden the day of the shooting. He agreed there were inconsistencies between Mr. Bolden's and Mr. Broom's statements. He said that once he brought the inconsistencies to Mr. Brooms's attention, Mr. Brooms invoked his right to counsel. He denied interviewing Mr. Bolden more than once.

Sergeant Long testified that he and another officer did not find any evidence when they returned to the scene the morning after the shooting. He said fingerprints and DNA were not found at the scene. He said that he arrived at the scene a few minutes after the 9-1-1 call was received and that the victim had been placed on a gurney but was not inside the ambulance. He said that .22 caliber shell casings and .40 caliber shell casings were "drastically different in size" and that it would be difficult to confuse them if a person had "any real base knowledge of firearms."

A portion of the victim's medical records were admitted as an exhibit and read to the jury. The discharge summary from the University of Tennessee Medical Center stated that the victim suffered multiple gunshot wounds on April 9, 2009, that his hospitalization was "prolonged and complicated," and that he was discharged on August 3, 2009. The summary stated that the victim received at least sixteen wounds. The victim was taken to the operating room for surgery, which showed the victim received a "bilateral hemopneumothoraces," a liver laceration, a through-and-through gunshot wound to the stomach, multiple small bowel

gunshot wounds, fractures to the right ulna and left humerus, and injuries to the cecum, sigmoid colon, and left subclavian artery and vein. After the surgery, the victim was placed in the intensive care unit and suffered complications, including massive blood loss. The victim underwent nineteen surgeries to repair his bowels and liver and to amputate his left arm.

Upon this evidence, the jury convicted the Defendant of attempted first degree murder and especially aggravated robbery. The trial court sentenced the Defendant to consecutive terms of twenty-two years' confinement. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his convictions. He argues there was insufficient evidence to identify him as the shooter. The State contends that the evidence established the Defendant's identity as the shooter beyond a reasonable doubt. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S .W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). "The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). Identity may be established with circumstantial evidence, and the "jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence. . . .'" Id.

(quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)).

In the light most favorable to the State, although the scene was dark the night of the shooting, the victim identified the Defendant as the person who shot him. The Defendant called the victim wanting to buy "some hydros," and the victim agreed to meet the Defendant at Ms. Price's apartment. The victim said that Ms. Price opened the door, that the Defendant pointed a gun at Ms. Price's face, and that the Defendant threatened to shoot Ms. Price if she did not return to her apartment. The Defendant shot the victim's leg and demanded the victim's money. The victim surrendered his money and said he would not report the shooting to the police. Mr. Bolden, who was with the Defendant, counted the money and said kill the victim after realizing the victim had seen their faces. The Defendant began shooting while the victim lay on the ground. The medical records showed the victim was admitted to the hospital on April 9, 2009, and released on August 3, 2009. The victim had extensive injuries resulting from multiple gunshot wounds and underwent multiple surgeries. The victim's left arm was amputated as result of his injuries.

Ms. Price opened her door minutes before the shooting and saw the victim and the Defendant outside. The Defendant pointed a gun at her face. Although she told the 9-1-1 dispatcher that the Defendant had a .22 caliber handgun, she admitted she guessed about the gun's caliber and was not knowledgeable about handguns. She also admitted that she was panicked and terrified that the victim was going to die.

We conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant shot the victim during the course of taking the victim's money by violence and that the victim sustained serious bodily injury as a result of the Defendant's using a deadly weapon. We also conclude that a rational trier of fact could have found beyond a reasonable doubt that although he was unsuccessful, the Defendant's conscious objective was to kill the victim to prevent the victim's identifying him to the police. The Defendant is not entitled to relief.

**II**

The Defendant contends that the trial court erred by ordering consecutive sentencing. He argues that his juvenile record did not justify the court's finding that he had an extensive history of criminal behavior and that the court improperly found he was a dangerous offender. The State responds that the court did not abuse its discretion. We agree with the State.

At the sentencing hearing, Latasha Scott testified for the defendant that she was his aunt and that during his childhood, his mother was the victim of habitual domestic violence.

-8-

She said the Defendant saw his mother dragged though their home naked and beaten. She said another male companion drove his car head-on into the Defendant's mother's car while the Defendant was inside. She agreed she took custody of the Defendant and his brother because of the violence at home. She said the Defendant suffered nightmares because of the violence. She denied the Defendant's having positive male role models in his life. She said the Defendant had very little contact with his father. She stated that Mr. Bolden was the Defendant's cousin and her nephew and that they were close. She apologized to the victim and his family.

The presentence report showed previous juvenile adjudications of delinquency for criminal trespass, theft, possessing alcohol while under the age of twenty-one, public intoxication, and causal exchange. The Defendant received diversion for the alcohol-related offense, and two months later, the juvenile court revoked his probation after he was arrested for aggravated robbery and sentenced him to confinement. With regard to the aggravated robbery arrest, the Defendant pleaded guilty in juvenile court to theft. The report showed that the Defendant had good mental and physical health. The Defendant successfully completed a drug and alcohol program in 2008.

Dr. Bruce G. Seidner, a clinical and forensic psychologist, evaluated the Defendant. His report reflects that the Defendant was diagnosed with a conduct disorder and attention deficit disorder and that he continued to use drugs and alcohol after completing the 2008 drug and alcohol program. Dr. Seidner did not find evidence of mental illness or a developmental disability. He concluded that the Defendant's "disruptive behavior" was caused by the conduct disorder but conceded that the Defendant acted impulsively and without consideration of long-term consequences. He also concluded that the Defendant was "an immediate and substantial threat to others" and that he believed there was a "high risk for future recidivism" without structure and accountability.

The trial court noted its consideration of the relevant statutory and other factors. With regard to mitigation, the court found that factor (3) applied because of the domestic abuse he witnessed as a child and the effect the violence had upon him. See T.C.A. § 40-35-113(3) (2010) ("Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense.").

The trial court found that statutory enhancement factors (1), (5), (6), (8), (10), and (16) applied. See T.C.A. § 40-35-114 (2010). The court found that factor (1) applied because the Defendant was previously convicted of armed robbery and possession with the intent to sell a controlled substance. See id. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range."). The court noted that although the Defendant pleaded guilty to theft,

the criminal behavior involved constituted aggravated robbery. The court stated that although it considered the previous juvenile adjudications to be "indicative of a very high propensity to commit violent crimes and the degree to which the [D]efendant presents a very great threat of harm to the community at large," it did not use the adjudications to determine the Defendant's sentencing range. The court gave significant weight to factor (1).

The trial court found that factor (5) applied because the Defendant and the victim were friends and because the Defendant lured the victim to a place where the Defendant knew he was going to commit an armed robbery. See id. § 40-35-114(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense."). The court found that the use of their friendship as a means to inflict harm on another was "at least somewhat cruel."

The court found that factor (6) applied because the personal injuries inflicted upon the victim were "far, far beyond the level of serious bodily injury necessary to support the convictions." See id. § 40-35-114(6) ("The personal injuries inflicted upon . . . the victim was particularly great."). The court noted that the Defendant shot the victim nine times with a .40 caliber handgun. The court noted the extent of the victim's injuries, including the loss of his arm, the prolonged hospital stay, the coma, and the extensive rehabilitation. The court said this factor weighed against the Defendant "to a very extreme extent."

The trial court found that enhancement factor (8) "somewhat applied" because after a term of confinement, the Defendant was released on a thirty-day home placement, during which the present offenses occurred. See id. § 40-35-114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community."). The court noted a Department of Children's Services report showed that the Defendant stayed at Mountain View Youth Development Center (Center) after committing a robbery and causal exchange, although the report is not included in the appellate record. The report showed that the Defendant did well there and worked in the kitchen.

The trial court found that the Defendant was released from the Center for a thirty-day home visit and that he committed the present offenses during that time based on the DCS report. The court found that factor (10) applied because before the shooting the Defendant pointed a gun at Ms. Price's face and ordered her inside her apartment. The court found that the Defendant showed no hesitation about committing a crime when the risk to human life was high. See id. § 40-35-114(10). The court found that factor (16) applied because of the Defendant's previous adjudication for possession of a controlled substance and because the underlying conduct of the theft adjudication satisfied the elements of aggravated robbery, which would have been felony offenses had the Defendant been an adult. See id. § 40-35-114(16) ("The defendant was adjudicated to have committed a delinquent act or acts as a

juvenile that would constitute a felony if committed by an adult."). We note that although the trial court said it relied upon the Defendant's conduct with regard to the theft adjudication in applying factor (16), there is no evidence in the appellate record establishing the Defendant's actions.

The trial court discussed a report from Cumberland Hall of Chattanooga dated April 17, 2009, although it is not included in the appellate record. The court found that the psychiatric evaluations showed that the Defendant was diagnosed with an adjustment disorder, depressed mood, polysubstance abuse of marijuana and alcohol, and a conduct disorder. Major depression and antisocial personality disorder were excluded. The court noted that the Defendant attempted suicide twice while at Cumberland Hall. The court said the report stated that the Defendant's primary problem was a lack of anger control and that the Defendant made homicidal threats while there. The court also noted Dr. Seidner's conclusions. The court found that although the Defendant was "intellectually limited," he was capable of conforming his conduct to the law but chose to violate the law with the use of deadly weapons and "horrific violence." The court found that nothing in the reports excused or justified the Defendant's conduct. The court found that the Defendant understood the nature of violence, having witnessed the abuse endured by his mother, as he shot the victim nine times. The trial court noted that although Mr. Bolden told the Defendant to kill the victim, the Defendant accepted Mr. Bolden's "judgment that the victim could not be trusted to keep his word."

The trial court ordered consecutive sentencing. The court found that the Defendant had a record of extensive criminal history because his previous conduct of violent offenses and possession of a controlled substance. The court found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. It found that the circumstances of the offenses were aggravated. The court found that the Defendant chose to be compliant and successful at Cumberland Hall and that Dr. Seidner concluded that the Defendant's history showed consistent and escalating violence and a high risk of recidivism. As a result, the court found that confinement for an extended period of time was necessary to protect the community from the Defendant's criminal activity. It found that consecutive sentencing reasonably related to the seriousness of or severity of the offenses.

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

(2) The defendant is an offender whose record of criminal activity is extensive; or

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

"These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). Our supreme court, though, concluded that when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995); see State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

We conclude that the trial court properly ordered consecutive sentences. The presentence report showed adjudications for theft and causal exchange, which the trial court relied upon in finding the Defendant had an extensive history of criminal activity. The presentence report also showed adjudications for public intoxication, criminal trespass, and being in possession of alcohol as a minor. Dr. Seidner concluded that the Defendant was an immediate and substantial risk to others and had a high risk of recidivism. The Defendant received diversion for the alcohol-related offense, and two months later, the Defendant's probation was revoked after he was arrested as a juvenile for aggravated robbery. He was sentenced to confinement. The Defendant was granted a thirty-day home visit and committed the present offenses during that time. We conclude that the Defendant had an extensive history of criminal behavior.

Likewise, the circumstances of the offense support the trial court's finding that the Defendant is a dangerous offender whose actions showed little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The Defendant called the victim to meet him in the parking area of Ms. Price's apartment. When Ms. Price saw the victim and the Defendant on her steps, she opened the door. The Defendant pointed a gun at her face and told her to go back inside. The victim recalled that the Defendant threatened to shoot her if she did not return to her apartment. The Defendant shot the victim without provocation, demanded the victim's money, and when the victim complied, shot him eight more times. Although Mr. Bolden told the Defendant to kill the victim, the Defendant did not hesitate in attempting to kill the victim to prevent his talking to the police. We agree with the court that an extended period of confinement is necessary to protect the public from the Defendant's criminal behavior and that the consecutive

-12-

sentences are reasonably related to the severity of the offenses committed.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE